IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

JORGE MARCANO and
WALESKA DEL RIO,                                               CASE NO.:

    Plaintiff,

vs.

NATIONSTAR MORTGAGE,
A Delaware Limited Liability Company

    Defendant,
_____/

## COMPLAINT FOR DAMAGES

Plaintiffs Jorge Marcano and Waleska Del Rio, by and through undersigned counsel, sue Defendant Nationstar Mortgage and allege:

### THE PARTIES, JURISIDICTION, AND VENUE

1.    Plaintiffs Jorge Marcano and Waleska Del Rio are natural persons over the age of 21. They are citizens of the United States, residing in the commonwealth of Puerto Rico and own property in Miami-Dade County, Florida. Plaintiffs will be referred to hereafter as "Borrowers."

2.    Defendant Nationstar Mortgage LLC is a Delaware limited liability company whose members, also Delaware limited liability companies, are wholly owned by NSM Holdings Inc., a Delaware corporation with its principal place of business in the State of Texas. This Defendant will be referred to hereafter as "Servicer." As a mortgage servicer, it is subject to federal laws and administrative regulations governing its mortgage servicing activities. These laws and regulations include, but are not limited to, the Real Estate Settlement Procedures Act,

1

12 U.S.C. § 2601 *et. seq.* (hereinafter RESPA) and Regulation X, 12 C.F.R part 1024, hereinafter "Regulation X."

3. At all material times, Servicer serviced Borrowers' mortgage loan secured by real property located in Miami-Dade County, Florida. Servicer engages in substantial business activity in the State of Florida and the territorial jurisdiction of this Court, and is therefore subject to this Court's jurisdiction.

4. In this action, Plaintiff pursues a claim under the Real Estate Settlement Procedures Act, 12 U.S.C §2601, et. seq. Thus, this action presents a federal question giving this Court subject matter jurisdiction over that claim under 28 U.S.C. § 1331.

5. All of the acts and omissions that rise to this lawsuit either occurred in Miami-Dade County, Florida or relate to real property and other business transactions located in Miami-Dade County, Florida. Accordingly, venue is proper in this Court.

## GENERAL ALLEGATIONS

6. Borrowers own a home located in Sunny Isles, Florida. This home is subject to a first mortgage lien that was created as a result of a transaction between Greenpoint Mortgage Funding, Inc. and Borrowers that was consummated on February 16th, 2006. Servicer currently services the subject mortgage loan.

7. As a mortgage servicer, Servicer is engaged in handling accounting, customer service, collection, and virtually all other services related to managing the residential mortgage loans in its portfolio. For all practical purposes, Servicer and other mortgage servicers generally appear to the borrowers whose loan they service as the mortgagee or "lender." However, this appearance is not reality. In fact, there is no debtor/creditor, or even any contractual relationship, between Plaintiffs and Servicer.

8. In its final rule and officer interpretations implementing the recently amended version of Regulation X, the Consumer Financial Protection Bureau describes the mortgage servicing industry as follows:[1]

> Mortgage servicing is performed by banks, thrifts, credit unions, and non-banks under a variety of business models. In some cases, creditors service mortgage loans that they originate or purchase and hold in portfolio. Other creditors sell the ownership of the underlying mortgage loan, but retain the mortgage servicing rights in order to retain the relationship with the borrower, as well as the servicing fee and other ancillary income.
>
> In still other cases, servicers have no role at all in origination or loan ownership, but rather purchase mortgage servicing rights on securitized loans or are hired to service a portfolio lender's loans. These different servicing structures can create difficulties for borrowers if a servicer makes mistakes, fails to invest sufficient resources in its servicing operations, or avoids opportunities to work with borrowers for the mutual benefit of both borrowers and owners or assignees of mortgage loans.
>
> ***
>
> Contracts between the servicer and the mortgage loan owner specify the rights and responsibilities of each party . . . servicer contracts govern servicer requirements to advance payments to owners of mortgage loans, and to recoup advances made by servicers, including from ultimate recoveries on liquidated properties.
>
> Compensation structures vary somewhat for loans held in portfolio and securitized loans, but have tended to make pure mortgage servicing (where the servicer has no role in origination) a high-volume, low-margin business. Such compensation structures incentivize servicers to ensure that investment in operations closely tracks servicer expectations of delinquent accounts, and an increase in the number of delinquent accounts a servicer must service beyond that projected by the servicer strains available servicer resources. A servicer will expect to recoup its investment in purchasing mortgage servicing rights and earn a profit primarily through a net servicing fee (which is typically expressed as a

---

[1] The text of this paragraph, as well as paragraphs, is quoted from the Final Rule and Official Interpretations promulgated by the Consumer Financial Protection Bureau, pages 14-17. Available at http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa.pdf (Last visted on November 6th, 2014).

    constant rate assessed on unpaid mortgage balances), interest float on payment accounts between receipt and disbursement, and cross-marketing other products and servicers to borrowers. Under this business model, servicers act primarily as payment collectors and processors, and will have limited incentives to provide other customer service. Servicers greatly vary in the extent to which they invest in customer service infrastructure. For example, servicer staffing rations have varied between approximately 100 loans per full-time employee to over 4,000 loans per full time employee. Servicers are generally not subject to market discipline from consumers because consumers have little opportunity to switch servicers. Rather, servicers compete to obtain business from the owners of loans—investors, assignees, and creditors—and thus competitive pressures tend to drive servicers to lower the price of servicing and scale their investment in providing service to customers accordingly.

  9. Borrowers fell behind on their mortgage payments, which ultimately led servicer to file a foreclosure lawsuit against them in the 11th Judicial Circuit in and for the State of Florida on or about September 18th, 2012.  The foreclosure action was filed on behalf of the mortgagee/creditor.  At the present time, that lawsuit remains pending, but the foreclosure plaintiff has yet to obtain valid service of process.

  10. On or about January 17th, 2014, Borrowers applied for a loan modification using the procedures established by the state court judge presiding over the foreclosure case's order of referral to mediation.  Those procedures designate a third party coordinator to receive the application materials, and forward them to the appropriate individual to receive them on behalf of the mortgage foreclosure plaintiff, here Servicer.

  11. On March 4th, 2014, the mediation was attended by the Plaintiffs and a representative from Servicer.  While Borrowers are bound by the settlement privilege not to discuss what happened at mediation, Borrowers can and do allege that at no point in time did Servicer acknowledge the application, request additional documentation in support of the application, or advise Borrowers of any decision concerning the application.

## COUNT I – VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT AND IMPLEMENTING REGULATION X REGARDING LOSS MITIGATION

12. Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 through 11 above.

13. Pursuant to Section 12 C.F. R. §1024.41(b), when a mortgage servicer receives a loss mitigation application at least 45 days before a scheduled foreclosure sale, that servicer must promptly review the application to determine whether it is complete or incomplete. The servicer must also notify the borrower within 5 days after the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the application is either complete or incomplete. Similarly, 12 C.F.R. §1024.41(c) requires a servicer to complete its evaluation of the borrower's loss mitigation application within 30 days.

14. Borrowers submitted their loss mitigation application to Servicer on January 29th, 2014. Since no foreclosure sale has ever been scheduled, Servicer was obligated to comply with all of 12 C.F.R. §1024.41's procedures.

15. However, Servicer, violated each of its obligations under 12 C. F. R. § 1024.41, by failing to acknowledge the application, determine whether it was complete or incomplete, or evaluate it within 30 days.

16. Regulation X unambiguously required Servicer to promptly acknowledge Borrower's application, determine whether it was complete or incomplete, and request any additional information needed to make the application complete, and complete its review of the loss mitigation application within 30 days.

17. Importantly, these deadlines are designed to provide borrowers with a meaningful opportunity to engage in loss mitigation and thereby avoid a preventable foreclosure.

18. Servicer completely failed to comply with any of its obligations under Regulation X in connection with Borrowers' loss mitigation application.

19. Pursuant to 12 C.F.R. § 1024.41(a) and 12 U.S.C. § 2605(f)), borrowers are expressly authorized to bring a civil action for violations of the Regulation X loss mitigation procedures.

20. As a result of Servicer's repeated violations of Regulation X's loss mitigation provisions discussed above, Borrowers have been damaged. These damages include, but are not limited to, attorney's fees and litigation costs expended in the state court foreclosure litigation and emotional distress.

21. Servicer's failure to comply with any of its obligations under RESPA and Regulation X are not isolated incidents. Rather they represent a pattern or practice whereby Servicer continually fails to comply with its Regulation X obligations. Servicer's routine failure to implement appropriate policies and procedure, train and employ qualified personnel, and devote sufficient resources to its servicing operations. Because Servicer had engaged in a pattern or practice of non-compliance with RESPA and a Regulation X concerning loss mitigation, Borrower is also entitled to an award of statutory damages.

22. Borrowers are also entitled to an award of prevailing party attorney's fees and litigation costs pursuant to 12 U.S.C. § 2605(f)(3).

23. WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including statutory damages, together with an award of attorney's fees and litigation costs.

## DEMAND FOR TRIAL BY JURY

Borrower demands trial by jury on all claims so triable.

Respectfully Submitted,


THE LAW OFFICES OF JEFFREY N. GOLANT, P.A.

1000 W. McNAB RD. STE. 150
POMPANO BEACH, FL 33069
Phone:  (954) 942-5270
Fax:     (954) 942-5272
Email:   jgolant@jeffreygolantlaw.com
By: **/S/ JEFFREY N. GOLANT ESQ.**
Fla. Bar. No. 0707732
*Attorney for Plaintiffs Jorge Marcano and Waleska Del Rio*